THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JOHNNY BUTLER, Defendant-Appellant.

First District (4th Division)    Nos. 76-1216, 77-624 cons.

Opinion filed July 27, 1978.

James J. Doherty, Public Defender, of Chicago (Aaron L. Meyers and Terrence McQuigg, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Myra J. Brown, and Armand L. Andry, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LINN delivered the opinion of the court:

At the conclusion of a jury trial in the circuit court of Cook County, defendant, Johnny Butler, was found guilty of attempted rape (Ill. Rev. Stat. 1977, ch. 38, pars. 8—4, 11—1). He was sentenced to a term of 5 to 15 years imprisonment. On appeal, defendant contends the trial court committed reversible error in permitting the State to cross-examine him concerning the details of a prior unrelated offense.

While we find the trial court did commit error, we nevertheless find the error harmless rather than prejudicial and, accordingly, we affirm.

Prior to the selection of the jury, the defense presented a motion *in limine* in which it sought to prevent the State from using a 1970 armed robbery conviction to impeach the defendant were he to testify in his own defense. After hearing arguments, the trial court denied the motion and ruled that evidence of the conviction could be admitted for purposes of impeachment.

At trial, the 23-year-old victim testified that in May 1975 she was a student at the University of Illinois, Chicago Circle. On May 3, between 4 and 5 p.m., the victim asserted she was walking alone on the campus' second level walkway toward the library building. A man, who she later identified as the defendant, approached her and asked if she had change for a dollar. She said she did not. When the defendant asked if she knew where he could acquire change, the victim responded that he should try the "pier room" in the Chicago Circle Center building. The defendant requested that she accompany him as he did not know where the room was located. Although initially refusing, after repeated requests she relented and began to walk with the defendant toward the Center.

As they were passing a miniature enclosed amphitheater on the second level walkway, the defendant grabbed the victim's hand and stated, "Give me your money." She refused. The defendant then told her he was going to rape her. She screamed. The defendant shoved his hand over her mouth and she bit it. The defendant then tore her coat off, pulled her into the amphitheater, punched her in the face and then ordered her to take her pants off, again saying he was going to rape her. She tried to run but the defendant grabbed her and forced her down upon her back. As he climbed on top of her, the victim stated that she scratched the defendant's face and kicked him. The defendant stood up and again said, "Take your pants off, I am going to rape you." The victim scrambled to her feet and tried to escape but the defendant caught her, pulled her down and began to beat her.

The ordering of the victim to take her pants off, her escape, recapture and beating repeated itself approximately five times. When the defendant caught her attempting to escape for the fifth time, he pulled her to the ground and began ramming her head against the concrete, stopping only after she agreed to unzip her pants. The victim, however, broke loose and attempted to run away. The defendant caught her, ripped the blouse from her shoulders and punched her in the face. Thereupon, the victim screamed as loud as she could and at that point, the defendant ran from the scene. The entire incident lasted approximately 15 minutes.

As she arranged her blouse and began to walk out of the amphitheater area, the victim testified she saw William Thomas, a University of Illinois policeman, running toward her. When the officer asked what had happened, she responded, "He tried to rape me." She described her assailant as black, five feet nine or ten, very thin, with an oval face, high cheek bones and almond eyes. He wore maroon pants and a white shirt with red polka dots. Later that same evening, the victim viewed a lineup at the police station and identified the defendant as her assailant. She also identified the defendant at trial.

Officer William Thomas testified that on May 3, 1975, he was in the Chicago Circle library building when he heard screams coming from outside. He rushed out onto the second level walkway and ran toward the screams. He saw a black male, who he later identified at the trial as the defendant, run out of the amphitheater 30 feet away and head for the east stairs leading to ground level. The defendant was wearing a black hip length jacket and maroon pants.

Officer Thomas broadcasted on his walkie-talkie the defendant's description and the direction in which he was running. The officer then observed the victim standing outside the amphitheater. He noted that her face was bloody, her clothes in disarray. She was crying and appeared to

be emotionally upset. She told Officer Thomas that a man had tried to rape her. She described her assailant in detail. On the way to the police station the victim revealed that the man who attacked her would have a bite mark on his hand.

James Bell, a University of Illinois police officer, testified that on May 3, 1975, at approximately 5 p.m. he was patrolling on foot the ground level area outside the Chicago Circle library building. He received a dispatch call that an attack had occurred on the second level walkway near the library and that the attacker was heading for the east stairs. As he dashed for the stairs, Officer Bell saw Richard Strieter, another University of Illinois police officer, running toward him from the opposite direction. When Officer Bell was approximately 30 feet from the stairs, he saw a man, who he later identified at the trial as the defendant, running down from the second level. The defendant paused on the last step, looked towards Officer Bell and then ran off.

The two officers gave chase but lost the defendant when he turned the corner of a building and disappeared among trees and shrubbery. Officer Strieter continued to search the area while Officer Bell returned to his squad car parked a short distance away. Officer Bell drove to a university parking lot located on the east side of campus at the corner of Polk and Halsted. He told the parking lot attendant to be on the lookout for a black male, about five feet nine, weighing 140 pounds, wearing a white shirt, black leather jacket and maroon pants. Officer Bell then returned to aid Officer Strieter in searching the area around the library building for the defendant.

While combing the campus area, the two officers received a dispatch call that the parking lot attendant had observed a man matching the description given him by Officer Bell. Both officers ran to their respective patrol cars and headed for the parking lot. Officer Bell reached the lot first. The attendant pointed down the street and yelled, "He went that way." Officer Bell drove off in the direction indicated and soon noticed the defendant walking on Jefferson Street. The defendant ran into a parking lot.

Officer Bell began a search of the lot and after about 30 seconds was joined by Officer Strieter. After a short period of time, Officer Bell heard Strieter call. When Bell looked up, Strieter was holding the defendant by the arm. Bell ran over to the two men and told the defendant he was under arrest. The defendant replied: "Why are you grabbing me for, I didn't touch no little girl. I'm looking for my car keys." Officer Bell testified that he then ascertained that the defendant did not own any automobile in the parking lot.

The defendant was handcuffed and taken to a Chicago police station.

Officer Bell asserted that at the station he noticed the defendant had a cut covered with dried blood over his left eyebrow and a fresh distinctive bite mark on his left hand just behind the base of the thumb.

Officer Strieter testified that on May 3, 1975, he was on foot patrol on the ground level of Chicago Circle campus. His testimony corroborated Officer Bell's version of what transpired that night at approximately 5 p.m. Officer Strieter received a broadcast from Officer Thomas that an attack had occurred on the second level walkway near the library and that the assailant was heading for the east stairs. Officer Strieter later at the trial identified the defendant as the man he subsequently saw run down the east stairs from the second level. Officer Strieter also testified that when he and Officer Bell later searched a parking lot on Jefferson Street, the defendant was found hiding underneath a car. While waiting at the Chicago police station for the lineup to be held, Officer Strieter noticed that the defendant had a scratch above his left eyebrow and three indentations that looked like teeth marks on his left hand just behind the base of the thumb.

On cross-examination both Officer Strieter and Officer Bell admitted that the joint report they submitted concerning defendant's apprehension contained nothing about a scratch on defendant's forehead, a bite mark on his hand or any statement he made when placed under arrest. The State then rested.

Officer Strieter was called as the first defense witness. He testified that the handcuffs placed on defendant at the time of the arrest could have made small impressions on defendant's wrists resembling teeth marks. Officer Strieter did not believe, however, that the marks on defendant's hand were made by the handcuffs.

The defendant took the stand and testified that in May of 1975 he was employed as a bus boy and stock clerk at a Burger King establishment located at 500 South State Street. On May 3 of that year he worked from 6 a.m. to 3 p.m. Following his shift, he relaxed on the restaurant's patio talking with friends.

At approximately 5:30 p.m. the defendant left Burger King with Bernard Lewis and Robert Mixon. The three men walked west on Harrison Street, the defendant intending to return to his home at 616 South Oakley. When they reached the corner of Harrison and Clinton, the three men split up. Lewis and Mixon caught a bus heading south. The defendant continued walking west on Harrison.

When the defendant reached the corner of Harrison and Jefferson, he dropped his house keys near a car. As he bent over to retrieve them, Officer Strieter pulled up in his squad car and yelled, "Don't move." The defendant informed Strieter that he was looking for his house keys. Officer Strieter told him he was under arrest. Defendant asked why and

Strieter answered, "For attempted rape." The defendant denied doing anything. He was then handcuffed and taken to the Circle Campus security station from where he was later transported to a Chicago police station.

The defendant testified that at the time of his arrest he had no cuts or scratches on his face, hands or wrists and there was no dirt, grease or blood on either his person or his clothing. He denied assaulting the victim.

On redirect examination, the defense attorney explored the defendant's prior arrest record:

"Q. Prior to May 3, 1975 were you ever arrested before that?
A. Yes.
Q. How old were you?
A. 17.
Q. And what happened with that case?
A. I pleaded guilty."

On re-cross-examination the prosecutor elicited the nature and year of the conviction and also delved into the details and circumstances surrounding the offense:

"Q. Mr. Butler when did you plead guilty to the other incident?
A. I can't quite remember. I know it was 1970. I can't quite remember the date.
Q. Pardon me?
A. I say it was 1970. I can't quite remember the date.
Q. And what was the nature of that charge?
A. Armed robbery.
Q. And where did that incident take place?
A. On the Circle Campus.
Q. On the University of Illinois Circle Campus?
A. Yes.
Q. You robbed a person?
A. It wasn't me. It was a friend of mine.
Q. You pled guilty, didn't you?
A. Yes.
Q. As a matter of fact, in that case—
Mr. McNulty: I am going to object.
Mr. Wolter: Well, he opened it up, Your Honor.
The Court: Overruled.
Mr. Wolter: Q. As a matter of fact, Mr. Butler, in that case you assaulted a student by grabbing her around the neck from the rear?
A. No, it was not me.
Q. It wasn't you?
A. No.
Q. You pled guilty for something that you didn't do?

A. Yes, sir.

Q. Pardon?

A. Yes, sir.

Q. As a matter of fact, that other incident that you pled guilty to but you didn't do took place very close to the second level in the forum, didn't it?

A. I don't know. I told you I didn't do it. I just pled guilty to it.

Q. You just pled guilty to it and received a felony conviction, right?

A. Yes, sir.

Q. But you didn't do it?

A. No, sir.

Q. And that was a young coed by the name of Mary Ann Neisling, wasn't it?

A. I don't know the name of her.

Q. That was on the second level of the same building?

A. I do not know about that.

Q. Did you use a knife in that case?

A. I do not know about that.

Q. Did the victim sustain lacerations on the neck?

A. I do not know about that.

Mr. McNulty: Objection.

The Court: Sustained.

Mr. Wolter: Q. Was there a co-defendant in the case?

A. Yes, there was a co-defendant.

Q. There was a co-defendant?

A. Yes.

Q. Did he plead guilty too?

A. Yes.

Q. What was his name?

A. I don't know his name.

Q. You don't know his name?

Nothing further."

Robert Mixon was called as a defense witness. He testified that in May 1975, he was employed as a porter at a Burger King establishment located at 500 South State Street. On May 3 he worked with the defendant from 7 a.m. to 3 p.m. At approximately 5 p.m., Mixon, Lewis and the defendant left Burger King and walked west on Harrison. When the three men reached the corner of Harrison and Clinton, Mixon and Lewis caught a bus heading south. The defendant continued walking west on Harrison. On cross-examination Mixon testified that he worked at Burger King continuously from March 18, 1973, through May 3, 1975. The defense then rested.

The State called Theresa Watt in rebuttal. Ms. Watt was a payroll clerk for Burger King, Inc. She testified that she had examined their personnel records regarding Robert Mixon and found that his employment was terminated in September 1974. Mixon was not rehired until September 1975. She also stated that it was not possible for anyone to be paid as a Burger King employee without there being a record of it. There were no records of any salary payments having been made to Mixon between April and July 1975.

Following the presentation of all the evidence and after having heard closing arguments, the jury deliberated and found the defendant guilty of attempted rape. The trial court conducted a presentence hearing and then sentenced the defendant to a term of 5 to 15 years imprisonment. This appeal followed.

OPINION

Defendant contends the trial court erred in allowing the State to cross-examine him concerning the details of his prior conviction. We agree.

■■ Evidence of crimes other than the one for which the accused is being tried is not admissible to establish a probability of his guilt by inferring that he is a man of criminal disposition and therefore had a propensity to commit the crime charged. (*People v. Lehman* (1955), 5 Ill. 2d 337, 125 N.E.2d 506; *People v. Cole* (1963), 29 Ill. 2d 501, 194 N.E.2d 269.) Such an inquiry is precluded not for lack of probative value (*Michelson v. United States* (1948), 335 U.S. 469, 93 L. Ed. 168, 69 S. Ct. 213; *People v. Lehman* (1955), 5 Ill. 2d 337, 125 N.E.2d 506), but because it may overpersuade the jurors and cause them to convict the defendant as an "evil person" worthy of punishment rather than because he is guilty of the crime charged (1 Wharton's Criminal Evidence §240 (13th ed. 1972); 1 Wigmore on Evidence §57 (3d ed. 1940)).

Evidence of other crimes may be admissible, however, if offered for some other purpose, such as to impeach the credibility of the accused when he takes the witness stand (*People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695; *People v. Ray* (1973), 54 Ill. 2d 377, 297 N.E.2d 168), or to prove motive, intent, identity, absence of mistake or accident, *modus operandi* or any fact in issue (*People v. McDonald* (1975), 62 Ill. 2d 448, 343 N.E.2d 489; *People v. Gonzales* (1978), 60 Ill. App. 3d 980, 377 N.E.2d 91).

■■ Merely because the State can demonstrate that its evidence of other crimes is not offered to show the defendant's criminal character, but as tending to prove some fact in issue, does not mean that the evidence is automatically admissible. (*People v. Oliver* (1977), 50 Ill. App. 3d 665, 365 N.E.2d 618.) The need of the prosecution to present evidence of other crimes and the probative value of that evidence in proving the issue for

which it is offered must be balanced against the obvious prejudicial effect its disclosure may have upon the jury. *People v. Sievers* (1978), 56 Ill. App. 3d 880, 885-86, 372 N.E.2d 705, 709 (Craven, J., dissenting); *People v. Pelate* (1977), 49 Ill. App. 3d 11, 363 N.E.2d 860; *People v. Butler* (1971), 133 Ill. App. 2d 299, 273 N.E.2d 37.

Initially, the State argues that its cross-examination of the defendant concerning the details of his prior conviction was appropriate since the defendant disclosed the existence of the conviction on redirect examination by his own counsel. Thus, the State contends the defendant "opened the door." We disagree.

Cross-examination of the defendant with regard to crimes other than the one for which he is on trial is permissible only when the examination is relevant to prove some issue in the case. This is true even though the existence of a prior conviction is disclosed by the defendant during his own direct or redirect examination. (*People v. Hines* (1967), 87 Ill. App. 2d 283, 232 N.E.2d 111; *People v. Scott* (1967), 82 Ill. App. 2d 109, 227 N.E.2d 72.) Consequently, the State's questioning of the defendant concerning the details of his prior conviction was proper only if the examination was relevant either: (1) to impeach the defendant's credibility; or (2) to prove a material issue in the case.

■■ In the context of impeaching the defendant's credibility, the State properly elicited from the defendant the nature of the prior crime with which he was charged and the year of his conviction. Beyond this, however, further details such as the name of the victim and the aggravating circumstances should not have been inquired into. McCormick on Evidence §43, at 88 (2d ed. 1972).

In the context of proving a material issue in the case, the State contends the details of the prior conviction were properly disclosed as this evidence tends to establish that the perpetrator of the prior crime (*i.e.*, the defendant here) is the person who committed the crime charged. We disagree.

Evidence of other crimes is admissible to prove *modus operandi* if there is some clear connection between the prior offense and the crime charged which creates a logical inference that if defendant was guilty of one he may be guilty of the other. This inference of identity does not arise from the mere fact that the charged and prior offenses share certain common features or marks of similarity, for it may be that these similarities are shared not only by the charged crime and defendant's prior offense but also by numerous distinct crimes committed by persons other than the defendant. (See 2 Wigmore on Evidence §411, at 385 (3d ed. 1940).) Rather, the inference is created when both offenses share peculiar and distinctive common features (*People v. Lehman* (1955), 5 Ill. 2d 337, 125 N.E.2d 506; *People v. Therriault* (1976), 42 Ill. App. 3d 876,

356 N.E.2d 999), so as to earmark both crimes as the handiwork of the accused (*People v. Osborn* (1977), 53 Ill. App. 3d 312, 368 N.E.2d 608; *People v. Emmett* (1975), 34 Ill. App. 3d 167, 340 N.E.2d 235; McCormick on Evidence §190, at 449 (2d ed. 1972)).[1]

■■ Even if we accept as true the details of the prior conviction as disclosed by the State,[2] there are only two similarities between defendant's prior armed robbery conviction and the crime of attempted rape with which he is now charged: (1) both offenses took place in approximately the same location; and (2) both victims were co-eds. These common similarities, considered singly or in combination, are insufficiently distinctive to raise the inference of identity. They can hardly be said to earmark both crimes as the handiwork of the defendant. Further, there are significant dissimilarities between the prior and the charged offense. In the prior offense the defendant: (1) worked with a partner; (2) used a knife; and (3) did not attempt to rape the co-ed.

There is no support in the evidence for the inference that the perpetrator of the prior offense (*i.e.*, the defendant here) is the person who committed the crime charged. Accordingly, it was error for the trial court to permit the State to cross-examine the defendant concerning the details of his prior conviction for the ostensible purpose of proving a common *modus operandi.*

■■ It is not our policy, however, to reverse merely because error has been committed. (*People v. Clark* (1976), 41 Ill. App. 3d 419, 354 N.E.2d 134; *People v. Jordan* (1974), 18 Ill. App. 3d 133, 309 N.E.2d 274.) Where, as here, there is other sufficient competent evidence which establishes defendant's guilt beyond any reasonable doubt, and it does not appear that the error complained of contributed to the jury's verdict of guilty, that error is harmless and reversal is not required. *People v. Tranowski* (1960), 20 Ill. 2d 11, 169 N.E.2d 347, *cert. denied* (1960), 364 U.S. 923, 5 L. Ed. 2d 262, 81 S. Ct. 290; *People v. Virgil* (1977), 54 Ill. App. 3d 682, 370 N.E.2d 74.

The victim, in this case, had ample opportunity to view her assailant at close range. Her preliminary description of him accurately fit the defendant's description when he was arrested. The lineup was held shortly after the attempted rape. The victim positively identified the defendant both at the lineup and in court. Her testimony was unwavering

---

[1] "[T]he inference need not depend upon one or more unique ° ° ° features common to the charged and uncharged offenses, for features of substantial but lesser distinctiveness, although insufficient to raise the inference if considered separately, may yield a distinctive combination if considered together." (*People v. Haston* (1968), 69 Cal. 2d 233, 245-46, 70 Cal. Rptr. 419, 427, 444 P.2d 91, 99.)

[2] The State did not introduce the record of conviction but merely cross-examined the defendant as to what it believed it knew were the details of the prior offense. The defendant, however, disclaimed knowledge about some details and denied others. For purposes of treating this issue we have taken the details disclosed by the State to be true.

and unimpeached. Further, the defendant was positively identified by three campus policemen whose testimony was also unwavering and unimpeached. Conversely, the credibility of the witness who corroborated defendant's alibi was substantially impeached. He had testified that he worked with the defendant at Burger King on the day of the incident. Yet the personnel records of Burger King indicated the witness was not employed the day of the incident.

Considering the evidence in its entirety, we believe there is no reasonable possibility that the jury would have acquitted the defendant had the evidence complained of been excluded. As the improper evidence did not contribute to the defendant's conviction, its admission was harmless and does not require reversal.

Accordingly, for the reasons set forth, we affirm the conviction of the defendant.

Affirmed.

JOHNSON, P. J., and ROMITI, J., concur.