THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DeANGELO JOHNSON, Defendant-Appellant.

First District (3rd Division)    No. 1—98—4680

Opinion filed November 15, 2000.

Rita A. Fry, Public Defender, of Chicago (Alison Edwards, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Kenneth T. McCurry, Alan J. Spellberg, and Janet Powers Doyle, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WOLFSON delivered the opinion of the court:

The defendant claims he was the victim of prosecutorial excess during his murder trial before a jury. He was. He was inaccurately described at trial as a convicted narcotics salesman and a convicted felon. In addition, his failure to testify was argued by inference and his lawyer was referred to as "a professional criminal defense lawyer."

Because the defendant's lawyer did not make timely objections,

and because the evidence was far from overwhelming, we apply a plain error analysis to events at trial. We conclude that serious trial errors, taken in combination, were not harmless beyond a reasonable doubt. We reverse the defendant's convictions and remand this cause for a new trial.

## FACTS

Around 4:30 p.m. on August 23, 1996, two young men wearing black sweatshirts fired gunshots into a group of people gathered near a bar on Chicago's west side. Four people were hit by bullets; three survived. Gary Thomas was killed.

Johnson and Bernard Williams (Williams) were indicted for first degree murder, attempted first degree murder, aggravated battery with a firearm, armed violence, and aggravated battery. On November 10, 1998, a jury found Johnson guilty of first degree murder and three counts of aggravated discharge of a firearm. The trial court sentenced Johnson to 75 years' imprisonment: a 45-year sentence on the murder conviction and three consecutive 10-year sentences on the three aggravated discharge of a firearm convictions. This appeal followed.

## DECISION

Johnson raises five issues on appeal: (1) whether evidence of his gang membership denied him a fair trial; (2) whether veiled evidence he failed a polygraph test denied him a fair trial; (3) whether evidence of his prior arrests and convictions denied him a fair trial; (4) whether the prosecution's closing argument denied him a fair trial; and (5) whether his attorney's ineffectiveness denied him a fair trial.

Johnson's attorney failed to raise the first three issues in a post-trial motion and did not consistently object in a timely manner. Johnson now attributes these omissions to ineffective assistance of counsel. We need not address *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), because the failure to preserve these issues implicates the plain error rule.

■ Illinois courts have consistently held a defendant who fails to raise an issue both at trial and in a posttrial motion forfeits the issue on appeal in the absence of plain error. *People v. Keene*, 169 Ill. 2d 1, 9-10, 660 N.E.2d 901 (1995); *People v. Enoch*, 122 Ill. 2d 176, 187, 522 N.E.2d 1124 (1988). Supreme Court Rule 615(a) provides: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." 134 Ill. 2d R. 615(a). The plain error rule bypasses normal forfeiture principles and allows reviewing court consideration when either "(1) the evidence is closely balanced; or (2) an error is so fundamental and of such

magnitude that the defendant was denied a fair trial." *People v. Nelson*, 193 Ill. 2d 216, 222 (2000); *People v. Lucas*, 151 Ill. 2d 461, 482, 603 N.E.2d 460 (1992); see *People v. Bunning*, 298 Ill. App. 3d 725, 727, 700 N.E.2d 716 (1998) ("The plain error rule may be invoked to protect the defendant from serious injustices and to preserve the integrity and reputation of the judicial process ***"). But as we said in *People v. Rivera*, 277 Ill. App. 3d 811, 823, 661 N.E.2d 429 (1996): "We add this cautionary note: responsible advocacy would not require us to engage in a plain error analysis. Errors that are plain on review ought to be plain at trial."

We believe errors were committed in this case. The jury heard statements and arguments from prosecutors that it should not have heard. These errors implicate fundamental constitutional rights of an accused. But before they may be considered we have to determine whether the evidence is so closely balanced or whether the errors we identify were so fundamental and of such magnitude that the defendant was denied a fair trial. If the evidence is closely balanced, we then would consider whether we could say the errors were harmless beyond a reasonable doubt.

At trial, the only eyewitness testimony came from Martin Nash (Nash), a member of the shooting target's street gang and a convicted felon serving a four-year narcotics sentence at the time of the trial. None of the wounded survivors identified the shooters. Nash testified Chicago police detectives investigating the shooting showed him a group of five photos, and he insisted he identified both Johnson and Williams in this photo array. But Detective Kriston Kato testified the photo array contained only Williams' photo and agreed Nash identified only Williams.

Additionally, the probative value of Johnson's written inculpatory statement was contested by defense testimony from Dr. Dawna Gutzman (Dr. Gutzman), a staff psychiatrist at Forensic Clinical Services. Dr. Gutzman asserted Johnson's low intelligence, reading impairment, and dependent personality cast doubt on his ability to understand and waive his *Miranda* warnings and made him more susceptible to suggestion than the average person. Cordelia Parker (Parker), Johnson's special education teacher, also testified for the defense. Parker said Johnson had a fourth-grade reading level at the end of the eighth grade.

■ Because we conclude the case was close, we examine Johnson's first three issues on their merits. Before turning to these issues, we note: "The admissibility of evidence at trial is a matter within the sound discretion of the trial court, and that court's decision may not

be overturned on appeal absent a clear abuse of discretion." *People v. Illgen*, 145 Ill. 2d 353, 364, 583 N.E.2d 515 (1991).

### 1. Gang Evidence

On September 12, 1996, Johnson signed an inculpatory statement, which Assistant State's Attorney Susan Ziegler read to the jury:

> "DeAngelo and Bernard were in a car when they saw [Eric Smith,] Puff. When they saw Puff he was with three of his friends one was Elroy. When they saw Puff they decided to go and get guns to teach him a lesson to leave DeAngelo and Bernard alone. Puff was the leader of a gang called the Dog Pound. When DeAngelo and Bernard wouldn't sell drugs for Puff he threatened them. On Aug 21, 1996 Puff shot Bernard's house up meaning they [sic] fired 15 shots into Bernard's house. So on Aug 23, 1996 when Bernard and DeAngelo saw Puff they decided to teach Puff a lesson."

Before trial, the prosecution filed a motion *in limine* to allow evidence of Johnson's gang affiliation. The trial court provisionally indicated it would not allow this evidence, but noted it would revisit this ruling during trial if the prosecution showed gang rivalry appeared to be the sole motive for the shooting.

At trial, the prosecution called Nash as a witness. Nash testified he was standing in front of a bar with Eric "Puff" Smith (Smith) and two other men on August 23, 1996. According to Nash, Smith, leader of a street gang called "The Dog Pound," saw two young men approaching and said, "Man, look, here come those mother fucker niggers; man, mother fucker travelers." There was no objection to the hearsay. When the prosecution asked Nash what Smith meant, defense counsel did object.

In a sidebar conference, the defense asked for a mistrial. The prosecution explained its view of the gang motive:

> "The Dog Pound is trying to recruit a couple of Traveling Vice Lords to sell drugs for the Dog Pound. The Dog Pound is a renegade street gang comprised of many different street gangs, most of whom are Vice Lords. He [Smith] tries to recruit two people to come to his gang to sell drugs for him. There may have been a previous altercation, but the retaliation by the Traveling Vice Lords is to get Puff, the leader of the Dog Pound. It is clear it is a gang motive. It is a gang retaliation."

The court overruled the objection: "I will allow the State to continue this line of inquire [sic] on the basis that the statement apparently indicates the reason for their going after Puff. And that being so, if Puff is a member of a different gang as related by this person who knows Puff, I would allow it." When the trial resumed, Nash said he understood Smith meant members of the Traveling Vice Lords

street gang were approaching. Nash testified he later told the police Smith "might know who they is [sic] because he [Smith] said they was [sic] Traveling Vice Lords." There was no objection to the hearsay testimony. Smith did not testify at the trial.

The prosecution also called Detective Kato as a witness. Detective Kato testified Johnson admitted he was a Traveling Vice Lord during questioning. According to Detective Kato, Johnson said his conflict with Smith began when Smith demanded Johnson and Williams sell drugs for the Dog Pound and they refused: "that's why the reason why Puff and the Dog Pound were mad at him and that's why the Dog Pound had shot at him previously."

> "[E]vidence of gang affiliation need not be excluded if it is otherwise relevant and admissible. [Citations.] It is generally held that evidence indicating the defendant was a member of a gang or was involved in gang-related activity is admissible to show common purpose or design, or to provide such a motive for an otherwise inexplicable act. [Citations.] Such evidence, however, is only admissible where there is sufficient proof that such membership or activity is related to the crime charged." *People v. Smith*, 141 Ill. 2d 40, 58, 565 N.E.2d 900 (1990).

Accord *People v. Colon*, 162 Ill. 2d 23, 29-30, 642 N.E.2d 118 (1994); *People v. Gonzalez*, 142 Ill. 2d 481, 488-89, 568 N.E.2d 864 (1991); see *People v. Williams*, 228 Ill. App. 3d 981, 989, 593 N.E.2d 968 (1992) ("Evidence of gang membership may be used to show motive ***").

■ It's a close call. This case involved personal revenge more than it did gang rivalry, but the prosecution showed gang affiliation may have played a part in the shooting. We cannot say allowing evidence of Johnson's gang affiliation was an abuse of discretion.

2. Polygraph Test Evidence

At trial, Detective Kato testified Johnson initially denied involvement in the shooting. After Nash identified Johnson and Williams in a lineup, Detective Kato spoke with Williams, who offered an alibi. Detective Kato discussed this alibi with Johnson, and Johnson "stated he was telling the truth and that he requested to be interviewed by another investigator and he suggested that Bernard Williams also be interviewed by another investigator." Detective Kato scheduled interviews for Johnson and Williams at Chicago police headquarters, but Williams declined the other interview. Detective Kato's partner took Johnson to his interview, and after Johnson returned to Area 4 police headquarters, the police confronted him with "the results of his interview downtown." According to Detective Kato, Johnson immediately agreed to tell the truth and made an inculpatory statement. Defense counsel never objected to this testimony.

During closing arguments, the prosecution discussed Detective Kato's testimony:

> "[Johnson] knows they are on to him. He knows they are—it's starting to stack up against him. One last chance. Let me go downtown. I'll show you. When he bombs that and he comes back in, he's confronted with the results of his interview downtown, he knows it's over."

Defense counsel never objected to this argument.

■ "[T]he general rule in Illinois is to preclude introduction of evidence regarding polygraph examinations and the results of those tests." *People v. Jefferson*, 184 Ill. 2d 486, 492, 705 N.E.2d 56 (1998); *People v. Finley*, 312 Ill. App. 3d 892, 895, 728 N.E.2d 101 (2000).

Recently, our supreme court found a veiled reference to a polygraph examiner was not a trial error: "The reference to an unspecified technician was sufficiently vague, and it would not have led jurors to any improper speculation." *Jefferson*, 184 Ill. 2d at 497. But the court did not preclude finding more extensive veiled references to polygraph testing can deny the defendant a fair trial.

In *People v. Mason*, 274 Ill. App. 3d 715, 725, 653 N.E.2d 1371 (1995), the prosecution told the jury the defendant spoke with a "technician" or an "examiner" at Chicago police headquarters and altered his version of events when he received "the results of those conversations." *Mason*, 274 Ill. App. 3d at 725. In closing arguments, the prosecutor said, "They [police] take him down to 11th and State and he talks to a technician and lo and behold, he changed his story." *Mason*, 274 Ill. App. 3d at 725.

We reversed on other grounds, but in *dicta*, we concluded the prosecution violated the spirit, if not the letter, of an *in limine* order barring polygraph evidence. *Mason*, 274 Ill. App. 3d at 724. We noted:

> "Even though the prosecutor and witnesses never said the words 'polygraph' and 'lie detector,' the State successfully signalled to the jury that the defendant had failed a polygraph examination. As the defendant has argued, jurors are sufficiently knowledgeable through their exposure to crime dramas and to news sources that police sometimes use polygraph examinations to assist them in their investigations." *Mason*, 274 Ill. App. 3d at 725.

But the prohibition against polygraph evidence is not absolute: "Polygraph evidence may be considered as a factor in determining whether the defendant gave a statement voluntarily." *People v. Montgomery*, 302 Ill. App. 3d 1, 11, 704 N.E.2d 816 (1998); see *People v. Jackson*, 198 Ill. App. 3d 831, 845, 556 N.E.2d 619 (1990). Although the defendant, in calling Dr. Gutzman, seemed to focus on Johnson's alleged inability to read and understand *Miranda* warnings and his

susceptibility to suggestion, his defense actually hinged on whether his confession was coerced.

■ The defense against the statements is contained in the evidence of Johnson's reading ability and suggestibility. Defense counsel in closing arguments:

> "You know what the force of interrogations are like. You have seen it in this courtroom. Who can stand the pressure? They wanted to get a statement out of him, whether he is retarded or whatever. That's what Miranda is about. Psychological coercion."

Detective Kato's testimony about an interview with another investigator and the results of Johnson's downtown interview, when coupled with the prosecution's closing argument that Johnson "bombed" that interview, left a clear inference that Johnson had taken and failed a polygraph test. But this inference was proper where Johnson contended his inculpatory statement was involuntary. The trial court did not abuse its discretion in allowing this evidence.

### 3. Prior Conviction Evidence

■ Before trial, the defense filed a motion *in limine* to bar evidence of Johnson's prior convictions. In a hearing on this motion, the defense expanded this motion to include evidence of Johnson's prior arrests.

At trial, Dr. Gutzman testified Johnson was unable to understand and waive his *Miranda* rights because of his low intelligence and his dependent personality. Dr. Gutzman acknowledged, "if an individual had previously been arrested, I would certainly take that into consideration in determining whether they were capable of waiving their rights." Dr. Gutzman knew Johnson previously had been arrested and assumed he previously had received *Miranda* warnings, but she could not draw any assumptions from Johnson's prior experience with the criminal justice system: "That information certainly is relevant. But is it very significant? No." There was no evidence Johnson in fact received *Miranda* warnings during his prior arrests.

On cross-examination, the prosecution asked Dr. Gutzman if she knew Johnson was twice arrested in 1994; she said yes. The prosecution asked Dr. Gutzman if she knew Johnson was twice convicted. The court sustained a defense objection. The prosecution then asked Dr. Gutzman if she would "consider it relevant if the defendant had previously spent time before the September 1996 arrest in the Department of Corrections." The court overruled a defense objection, and Dr. Gutzman answered: "Well, it's relevant but I wouldn't know what to make of it."

On further cross-examination, the prosecution asked Dr. Gutzman:

"Q. He [Johnson] was arrested in 1994 on two separate occasions for selling narcotics?

A. Okay.

Q. He was convicted on both of those charges?

A. Okay.

Q. Before being convicted on any of those charges, he was sent to court and had a lawyer appointed for him?

A. All right.

Q. He had a lawyer represent him throughout the first charge of selling narcotics?"

Before Dr. Gutzman could answer, defense counsel objected. The court said, "I don't know if the witness will be able to answer that. It would be hearsay." The prosecution continued: "You are aware that the defendant spent time in custody on those crimes?" The court sustained a defense relevance objection to this line of questioning.

The defense opened the evidentiary door to questions about whether Johnson received *Miranda* warnings during prior arrests. Dr. Gutzman said she knew about Johnson's prior arrests, assumed he received *Miranda* warnings, and denied this evidence changed her opinion. The defense, however, did not open the door to questions about Johnson's 1994 and 1995 delinquency findings in the juvenile court.

" 'There is no question more damaging to a defendant with a jury than one that suggests or intimates that he is a criminal or has been charged with a criminal offense.' " *People v. Harges*, 87 Ill. App. 2d 376, 380-81, 236 N.E.2d 650 (1967), quoting *People v. Decker*, 310 Ill. 234, 243, 141 N.E. 710 (1923); accord *People v. Cortes*, 181 Ill. 2d 249, 282, 692 N.E.2d 1129 (1998) ("evidence of other crimes is not admissible if it is relevant merely to establish the defendant's propensity to commit crime"); *People v. Thingvold*, 145 Ill. 2d 441, 452, 584 N.E.2d 89 (1991); *People v. Lindgren*, 79 Ill. 2d 129, 137, 402 N.E.2d 238 (1980); *People v. Butler*, 63 Ill. App. 3d 132, 139, 379 N.E.2d 703 (1978); *cf. Nelson*, 193 Ill. 2d at 224-25 (positing jury speculation about mug shots "could have been the difference between conviction and acquittal"). The prosecution failed to show how evidence of Johnson's "convictions" related to his ability to understand *Miranda* warnings. We see no connection. The questions about "convictions" were unnecessary and unfairly prejudicial.

Additionally, the prosecution's references to "selling narcotics" in its questions and Johnson's "narcotics salesman job" during final argument are troublesome. The jury certainly heard no testimony Johnson ever sold "narcotics" as defined in the Illinois Controlled Substances Act (see 720 ILCS 570/102(aa) (West 1998)), and the record contains no evidence to that effect.

In the hearing on Johnson's motion to suppress his statements, Chicago police officer James Butler testified he arrested Johnson in 1995 for "delivery of cannabis," and Chicago police officer Adrian Garcia testified he arrested Johnson in 1994 for "delivery of controlled substance."

The adult probation department report on Johnson showed a July 25, 1994, finding of delinquency for delivery of a controlled substance and possession of a controlled substance, for which he received one year probation and mandatory counseling, and a March 23, 1995, finding of delinquency for delivery of a controlled substance and violation of probation, for which he received one year probation. Nothing in the record tells us what the "controlled substance" was. It was a gross distortion to say Johnson was twice arrested and convicted in 1994 for "selling narcotics."

The Chicago police department criminal history for Johnson, alias Donald Ware, showed March 26 and April 25, 1995, arrests for "Manu/ Del Cann." These cannabis cases were dismissed. The prosecutor, in final argument, referred to Johnson as a "convicted felon." Johnson was not a convicted felon. He was a delinquent. See 705 ILCS 405/5—3(1), 5—20 (West 1996).

Allowing these statements by the prosecution was an abuse of discretion.

### 4. Closing Argument

■ In its closing argument, the prosecution said:

"There is absolutely no evidence before you to attack the validity of [Johnson's inculpatory] statement. Nothing. It is uncontested. An attorney can stand before you and argue all he wants about what he wishes the statement to say or what it doesn't say. But you know what? There is no evidence to contradict the validity of the statement. None."

Later, referring to Johnson, the prosecution added:

"You know, how dare this guy complain about his rights? What about the rights of Mr. Thomas? Never mentioned anything about those rights. Unfortunately for Gary Thomas, this guy [Johnson] and his partner over here, Bernard Williams, were his judge, his jury, and his executioner. Now this guy [Johnson], without presenting any evidence, wants to complain through his lawyer standing at a podium about his rights."

The defense attorney objected, and the court instructed the jury, "The Defendant does not have to take the stand in his own defense." But the judge did not rule on the defense objection. Nor did he instruct the jury to disregard the statement. Undeterred, the prosecution pressed on: "You know, it never ends. They have no defense."

Generally, the prosecution has wide latitude in fashioning its closing argument, and reversal is unwarranted unless the prosecution's comments substantially prejudice the defendant. *People v. Enis*, 163 Ill. 2d 367, 407, 645 N.E.2d 856 (1994); *People v. Strong*, 274 Ill. App. 3d 130, 139, 653 N.E.2d 938 (1995). Comments implying the jury should penalize the defendant for exercising his constitutional right not to testify (see *People v. Ray*, 126 Ill. App. 3d 656, 661, 467 N.E.2d 1078 (1984); *People v. Johnson*, 35 Ill. App. 3d 666, 669-70, 341 N.E.2d 443 (1976); *People v. Chellew*, 104 Ill. App. 2d 100, 107, 243 N.E.2d 49 (1968)) and comments asking the jury to vindicate the victim's rights (see *People v. Beringer*, 151 Ill. App. 3d 558, 563, 503 N.E.2d 778 (1987)) are prejudicial.

Here, the prosecution improperly commented on both Johnson's silence and the victim's rights. The prosecution also commented on Johnson's defense attorney:

> "[D]o you think that was easy for Martin Nash to be pulled up here from the Department of Corrections and be asked questions by a bunch of lawyers only to have a professional criminal defense lawyer hired to represent one of the two people who almost killed you get up there and ridicule you and belittle you and then stand before a jury and call him a buffoon and a clown. Then we wonder why people don't come forward."

This court has held references to defense counsel as a "paid advocate" (*People v. Hawkins*, 284 Ill. App. 3d 1011, 1016, 675 N.E.2d 642 (1996)) warrant reversal where the evidence is closely balanced. The prosecution's pejorative reference to defense counsel "denigrate[d] the assistance of counsel to which the accused is constitutionally entitled." *Hawkins*, 284 Ill. App. 3d at 1016.

These comments, taken together, ask the jury to penalize Johnson for exercising both his fifth amendment privilege against self-incrimination and his sixth amendment right to counsel. But were these comments, as well as the State's references to Johnson's "convictions" for "selling narcotics," harmless errors?

■ For the harmless error doctrine to apply, a reviewing court must find, beyond a reasonable doubt, the error or errors did not contribute to the defendant's conviction. See *People v. St. Pierre*, 122 Ill. 2d 95, 113-14 (1988), citing *Chapman v. California*, 386 U.S. 18, 23, 17 L. Ed. 2d 705, 710, 87 S. Ct. 824, 827 (1967). Errors may be harmless if they did not contribute to the defendant's conviction or overwhelming evidence supported the defendant's conviction. See *People v. Averhart*, 311 Ill. App. 3d 492, 507, 724 N.E.2d 154 (1999).

■ Each of the errors we have discussed casts doubt on the fairness of Johnson's trial. We need not decide whether any one error

would result in reversal. "Cumulatively, we find that the errors created a pervasive pattern of unfair prejudice to defendant's case." *People v. Blue*, 189 Ill. 2d 99, 139, 724 N.E.2d 920 (2000). Because these errors, taken together, may have contributed to Johnson's conviction and because evidence of Johnson's guilt was not overwhelming, we cannot say these errors were harmless beyond a reasonable doubt. See *People v. Derr*, 316 Ill. App. 3d 272 (2000); *People v. Morgason*, 311 Ill. App. 3d 1005, 726 N.E.2d 749 (2000).

Finally, in supplemental briefs, the parties discuss the application of *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), to Johnson's consecutive sentences. Because of our disposition of this case, we do not address the sentencing issue.

CONCLUSION

For these reasons, we reverse the defendant's conviction. Because we believe this record contains enough admissible evidence to support a conviction on retrial, we remand for further proceedings.

Reversed and remanded.

HALL, P.J., and BURKE, J., concur.