# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Johnson*, 2011 IL App (1st) 092817

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DEANGELO JOHNSON, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-09-2817 |
| Filed | December 16, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's postconviction petition alleging that his trial counsel was ineffective in failing to investigate defendant's claim that his inculpatory statement was coerced by a detective was properly dismissed at the second stage of the proceedings, since defendant's bare allegations were insufficient to make a substantial showing of defense counsel's ineffectiveness–first degree murder and aggravated battery. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 96-CR-25384; the Hon. Joseph M. Claps, Judge, presiding. |
| Judgment | Affirmed; sentencing order and mittimus corrected and modified. |

Counsel on
Appeal

Michael J. Pelletier and Alan D. Goldberg, both of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Joan Frazier, and Marie Quinlivan Czech, of counsel), for the People.

Panel

PRESIDING JUSTICE R. GORDON delivered the judgment of the court, with opinion.

Justices Garcia and Lampkin concurred in the judgment and opinion.

## OPINION

¶ 1    Following a jury trial, defendant Deangelo Johnson was convicted of first degree murder (720 ILCS 5/9-1(a)(2) (West 1992)) and three counts of aggravated battery with a firearm (720 ILCS 5/12-4.2(a)(1) (West 1992)). Defendant was sentenced to 45 years for the murder, and 10 years for each of the aggravated battery charges, to be served consecutively, for a total of 75 years in the Illinois Department of Corrections. His conviction was reversed on appeal (*People v. Johnson*, 317 Ill. App. 3d 666 (2000)), but the Illinois Supreme Court reversed the appellate court and remanded the case to the appellate court for consideration of defendant's claims of ineffectiveness of counsel (*People v. Johnson*, 208 Ill. 2d 53 (2004)). On remand, the appellate court affirmed defendant's conviction. *People v. Johnson*, No. 1-98-4680 (2004) (summary order).

¶ 2    Defendant filed a petition for postconviction relief, in which he claimed in part that trial counsel was ineffective for failing to investigate defendant's claims that his inculpatory statement was physically coerced by Detective Kriston Kato, that the State withheld exculpatory evidence by failing to turn over evidence of a pattern of Kato abusing suspects, and that appellate counsel was ineffective in failing to raise the issues on appeal. The postconviction petition was denied at the second stage, and defendant appeals, claiming: (1) he made a substantial showing that his right to effective counsel was violated and (2) two of defendant's consecutive sentences are void because the victims did not suffer severe bodily injury. We affirm.

¶ 3                                    BACKGROUND

¶ 4    On August 23, 1996, Gary Thomas was killed and three others were injured during a shooting near a tavern named Wash's Place in Chicago. On September 11, 1996, defendant, who was 17 years old at the time, and Bernard Williams were arrested and subsequently indicted for first degree murder, attempted first degree murder (720 ILCS 5/8-4, 9-1 (West 1992)), aggravated battery and aggravated battery with a firearm, and armed violence (720 ILCS 5/33A-2 (West 1992)). The State ultimately proceeded solely on the first degree

murder, attempted first degree murder, and aggravated battery with a firearm charges.

¶ 5                                         I. Motion to Suppress

¶ 6        On November 6, 1997, defendant, represented by an assistant public defender, filed a motion to suppress any statements he made in connection with his arrest. The motion claimed that defendant was not provided with his *Miranda* rights prior to being interrogated, that he was incapable of waiving his *Miranda* rights because he did not understand them, and that the statements were obtained as a result of physical coercion. We relate only the testimony concerning coercion, which is the primary issue on this appeal.

¶ 7        Assistant State's Attorney Susan Ziegler testified on behalf of the State. Ziegler testified that she was present at Area 4 police headquarters (Area 4) on the evening of September 11, 1996. At approximately 3 a.m., she interviewed defendant, who was not in handcuffs at the time. At one point during her interview, Ziegler and another assistant State's Attorney spoke to defendant outside the presence of any police officers, and Ziegler spoke to defendant about his treatment while in custody. Ziegler testified that defendant told her he was treated well by the police and did not complain about his treatment or any injuries that he sustained. Ziegler also did not observe any abusive behavior by Kato while she was present or notice any injuries. At approximately 4 a.m., Ziegler memorialized defendant's oral statement in writing and reviewed it with defendant; the other assistant State's Attorney and Kato were present while she was writing the statement and reviewing it with defendant. She testified that defendant made some corrections and additions to the statement. After the statement was completed, Ziegler took a Polaroid photograph of defendant.

¶ 8        The State also called Detective Kriston Kato as a witness. Kato testified that he and his partner were assigned to investigate the homicide of Gary Thomas and interviewed defendant for 15 minutes at approximately 2 a.m. on September 11, 1996.[1] Defendant was uncuffed at the time. Defendant denied any knowledge of the murder, and Kato confronted him with statements Kato had obtained from interviews conducted with Bernard Williams and Shawn Harris, a witness. In response, defendant stated that he was telling the truth, he had been in Evanston at the time, Williams and Harris were lying, and he would appear in a lineup to prove that he was being truthful.

¶ 9        Kato next spoke with defendant at approximately 5 a.m., when he told defendant that he was unable to obtain the people needed to view a lineup, but he would attempt it again in a few hours. Kato instructed defendant that Kato was leaving and that if he needed anything, to knock on the door. He told defendant that if he needed to use the restroom or wished to eat or drink anything, Kato's supervisor was next door and would comply with his needs. Defendant told Kato that he did not wish to eat at the time but wanted something to drink. Defendant was permitted to sleep; he was alone in the room, uncuffed, and the light switch was located inside the room, although Kato did not show defendant the location of the light switch. Kato's partner was not present during the conversation.

---

[1]Kato testified that defendant was brought to Area 4 at approximately 1 a.m. on September 11, 1996.

¶ 10    Kato testified that he returned to the room at approximately 4:30 p.m. with food for himself and defendant. Kato did not interview defendant at that time but gave him a hot dog. Kato left to look for witnesses, and located Martin Nash, an eyewitness to the shooting. Kato brought Nash back to Area 4 and arranged for a lineup, which occurred at approximately 6:10 p.m. Defendant and Williams both participated in the lineup and Nash identified them as the offenders.

¶ 11    Kato and his partner again interviewed defendant for 10 to 15 minutes at approximately 7 p.m. that evening; again, defendant was uncuffed. Kato informed defendant that he had been positively identified in the lineup, but defendant continued to deny participation in the murder. Kato then confronted defendant again with an oral statement Williams had made indicating that defendant was involved. Defendant stated that Williams was lying and that he wished to undergo a polygraph examination to prove that he was telling the truth. Kato scheduled polygraph examinations for defendant and Williams that evening. Shortly before 10 p.m., defendant was transported to a different location to participate in the polygraph examination, and he was returned to Area 4 at approximately 1:20 a.m. on September 12, 1996. Kato testified that the only food defendant had consumed through the time including the polygraph examination was the hot dog.

¶ 12    At approximately 1:30 a.m., Kato and his partner interviewed defendant for approximately 30 to 40 minutes and confronted him with the results of the polygraph examination, telling defendant that the test showed his knowledge of the murder. At that point, defendant stated that "he wanted to tell the truth" and gave his real name[2] and admitted to being one of the shooters. Kato contacted the State's Attorney's felony review unit, and two assistant State's Attorneys, including Ziegler, came to Area 4.

¶ 13    Kato denied striking defendant in the throat, hitting him with a telephone book, slapping him in the face, or severely tightening his handcuffs. Kato testified that defendant was never handcuffed during his interviews. He testified that there was a ring attached to the wall for the purpose of handcuffing people, but that it was not used for defendant.

¶ 14    Defendant testified that in September 1996, he was arrested along with Williams and Harris and taken to Area 4 at approximately 8 or 9 p.m. The three men were placed in separate rooms, and defendant's room had no windows and required someone to "let you out." Defendant sat on a steel bench and his right hand was handcuffed to the ring on the wall. Defendant was alone for approximately one hour, then Kato came into the room. He asked defendant whether he knew "who did that" and defendant responded that he did not know what Kato was talking about, so Kato left.

¶ 15    Some time later, a woman came in and took defendant to the washroom. She asked defendant whether he was hungry and defendant said he was not. When he returned to the room, defendant was not handcuffed. Approximately 30 minutes later, Kato returned and handcuffed defendant to the ring in the wall. Kato sat next to defendant and questioned defendant again, and defendant responded that he did not know what Kato was talking about. Kato told defendant to " '[j]ust tell me Poo Bear did it and I will let you go.' " Defendant told

---

[2]Defendant initially stated his name was Donald Ware.

Kato that he did not know "Poo Bear," and Kato "karate-chopped" defendant in the throat and told defendant that he would be back; defendant testified that he could not swallow after the karate-chop. Approximately five minutes later, defendant heard Williams screaming " 'Oh, no, no' " in the next room. Kato returned, again asked defendant whether he was " 'ready to tell' " Kato, and defendant responded that he did not know "Poo Bear." At some point, he told Kato that he was at his aunt's house in Evanston at the time of the murder. Kato accused defendant of lying and left.

¶ 16     Eventually, a woman returned and took defendant to the washroom and gave him a bologna sandwich. Defendant was handcuffed to the wall again, but the handcuff was not tight. Defendant attempted to sleep, but the handcuff cut into his wrist and he was unable to sleep.

¶ 17     The next day, Kato returned and sat down. He asked defendant whether he was " 'ready to tell me now,' " and when defendant told him he did not know what Kato was talking about, Kato "back-handed [defendant], slapped [him]" in the face. Kato left the room and immediately returned, sitting on a chair in front of defendant. Kato told defendant, " 'We got you, you going down,' " and defendant responded that " 'I ain't did nothing.' " When defendant raised his head, Kato again karate-chopped defendant in the throat. Defendant told Kato, " 'Man, why you got to sit up here and hit on a person? I told you I don't know nothing,' " and Kato asked defendant if he would take a polygraph. Defendant agreed and was taken for the examination that night. During the polygraph examination, defendant denied knowing anything about the murder, and the technician told the officers that defendant had knowledge of the crime. Defendant was handcuffed and taken back to Area 4.

¶ 18     After returning, defendant participated in a lineup, and Kato asked defendant if he wished to speak with anyone. Defendant said that he wanted to call home, but Kato would not allow defendant to make any phone calls " 'until after we get through with you.' " Kato left, then immediately came back and asked defendant if he was sure that he did not wish to speak with anyone. Defendant repeated that he wanted to speak to his family, and Kato gave him a telephone book and told defendant to hold it up to his chest. Kato then hit defendant in the chest with "some black thing" and hit him in the face several more times with his hand. Kato told defendant that once defendant spoke to some people, he could leave, and defendant agreed.

¶ 19     Kato took defendant to a room with two people.[3] The people asked defendant if he had anything to tell them, and Kato began "making up some stuff," then looked at defendant "mean" and said " '[a]nd what else happened.' " Defendant and Kato then made up a story. The people told defendant to sign his name on a document, and he did so; defendant did not read the document, nor did anyone read it to him. Defendant testified that he was scared of Kato and would not have spoken to the people had it not been for Kato.

¶ 20     Defendant testified that when Kato hit him in the chest, it left a red mark that lasted for

_____

[3]Defendant was unable to recall the names of the people, but he later identified one of them as Ziegler.

three or four days. Additionally, every time that Kato returned to the room, he would tighten defendant's handcuffs to the point where defendant could hardly move his wrist and could not feel his hand. Defendant testified that he had marks on his wrist, and he showed his wrist to the judge at the hearing.[4] Defendant was examined by a medical provider when he complained about the numbness in his hand while he was in custody.

¶ 21    The parties also stipulated to the testimony of paramedic Stanislawski[5], who would testify that he interviewed and examined defendant on September 13, 1996. Defendant did not complain of any injuries and his general appearance was good, with "no bruises, cuts, swelling, source, amputation, badges, cast scars, [or] contusions."

¶ 22    The trial court found that defendant was given the proper *Miranda* warnings and further stated:

> "Concerning the alleged striking by Detective Kato as alleged by the defendant where it is denied by Detective Kato and whether or not he was informed of the results of the line up and of the co-defendant's statements. In assessing who to believe where there is a contradiction in the evidence I have to review all the evidence. In doing so I find that there is *** a pattern of untruthfulness on the part of the defendant. On many basis [*sic*], many of which have been argued by the State, others which have not been discussed or mentioned and even on the stand he contradicted himself as to whether or not he read part of the statement out loud at first saying on cross that he did and then denying that he didn't.
>
> * * *
>
> There is no corroboration of any abuse by Detective Kato, and because of what I find otherwise in the defendant's conduct throughout this entire matter and on the previous arrests where false information was given to police, both as to name and date of birth, that I do not believe the things that he testified to regarding Detective Kato occurred. I would therefore admit the statement over the defense objection."

¶ 23                                   II. Trial

¶ 24    Defendant's trial began on November 4, 1998, and defendant was represented by a private attorney.[6] As part of his opening statement, defendant's counsel urged the jury to "look upon the reliability of [defendant's] statement." We relate only the testimony that is relevant to the issues on appeal.

¶ 25    Martin Nash testified on behalf of the State. At the time of trial, Nash was serving a four-

---

[4]It is not clear what the extent of any marks were. Defendant testified that the mark on his wrist was visible, and his attorney asked him to show it to the judge. The judge responded, "[s]o noted."

[5]The paramedic's first name does not appear in the record.

[6]Defendant and Williams had separate trials but were tried simultaneously, with Williams receiving a bench trial and defendant receiving a jury trial.

year sentence in the Illinois Department of Corrections for a felony narcotics charge to which he pled guilty. Nash testified that on August 23, 1996, at approximately 4:30 p.m., he was in front of Wash's Place with Eric Smith, also known as Puff; Irving Young, also known as Pokey; and Gary Thomas, also known as Buster. Nash was there with his 11-year-old son. Nash testified that Puff was the leader of a gang known as the Dog Pound; Nash denied being a member of the Dog Pound. Smith was playing with Nash's son when he looked down the street and said, " 'Man, look, here come those m*** f*** n***; man, m*** f*** travelers.' " Nash testified that the term "travelers" referred to a gang called the Traveling Vice Lords. Nash looked down the street and saw two men approaching them. They wore black hoods, black sweatshirts, and black leather gloves. Nash described the men as between 19 and 21 years old and identified defendant and Williams in court as the men he observed.

¶ 26 Nash testified that after Smith made his comment, the men reached into their waistbands and both pulled out guns, pointing them to where he was standing with Thomas, Young, and Smith and beginning to shoot, running toward them until they were approximately 20 feet away. As they were shooting, their hoods came down. Nash ran, but his son was "in shock" and was standing still. Nash turned to retrieve his son, looking at the men firing their guns. Thomas said, " 'I'm hit,' " and fell. Nash grabbed his son and ran with his son to the alley on the side of Wash's Place. He observed the two men running away.

¶ 27 Nash testified that he spoke to the police at the hospital where Thomas was taken. He described the men he observed, including that one man was tall and slim with braids in his hair and the second was a bit shorter and "bigger." He also told the police that Smith would likely know them since they were Traveling Vice Lords. He was contacted again by the police on September 2, 1996. Nash was shown a group of five photographs and identified defendant and Williams. On September 11, 1996, Nash viewed a lineup and identified defendant and Williams as the shooters.[7]

¶ 28 Detective Kato also testified on behalf of the State. Kato testified that on September 2, 1996, he and his partner located Smith and interviewed him. After speaking with Smith, Kato sought to arrest Williams. Kato met with Nash and showed him a group of five photographs, one of which was a photograph of Williams. Nash identified Williams. Kato testified that there was no photograph of defendant in the photo array.

¶ 29 After Nash identified Williams, Kato and his partner tried to locate Williams. At approximately midnight on September 11, 1996, they located Williams in a vehicle and arrested him. Along with Williams, there were two other men in the vehicle, Shawn Harris and defendant, who identified himself as Donald Ware. Defendant and Harris accompanied Kato to Area 4, where they waited in a waiting area while Kato interviewed Williams. During the interview, Williams identified Harris and defendant as his alibi. The two were then placed in separate interview rooms. After Kato and his partner spoke to Harris, defendant was considered a suspect.

¶ 30 Kato and his partner then spoke with defendant, at approximately 2 a.m., and defendant

---

[7]Nash testified both that he identified one person in the lineup and that he identified two people.

informed them that "he had no knowledge of the incident, he did not participate in any shooting and that at the time of the shooting he was in Evanston." Kato confronted defendant with Williams' and Harris's statements and he stated that both were lying. Kato informed defendant that he was going to conduct a lineup after he located a witness and defendant stated that he would appear in the lineup to prove that Williams and Harris were lying.

¶ 31 Kato left to attempt to locate Smith and Nash for a lineup but was unsuccessful. He returned to the police station at approximately 5 a.m. and informed the people held in interview rooms that he and his partner were leaving, but that if they needed anything, they should knock on the door and a supervisor would respond. Kato returned at approximately 4:30 p.m., delivered food to the people in the interview rooms, and left to find Nash and Smith. Kato and his partner located Nash and brought him to the police station for a lineup. They conducted the lineup at approximately 6 p.m., and the lineup included Williams, Harris, defendant, and two other "fillers." Nash identified both Williams and defendant.

¶ 32 After the lineup, Kato and his partner spoke with Williams again, and then interviewed defendant a second time. They informed defendant that he had been identified in the lineup and defendant still denied being involved. They then confronted him with what Williams had just told them and defendant stated that he was telling the truth and requested to be interviewed by another investigator.[8] Kato left to schedule the interview with the other investigator at Chicago police headquarters. Kato made arrangements for the interview to be conducted at 10 a.m. and left to locate Smith. Kato testified that he was never able to locate Smith.

¶ 33 When Kato returned, another detective informed him that defendant wished to speak with him. Kato spoke with defendant and called the felony review unit of the State's Attorney's office. Assistant State's Attorneys Ziegler and Dorner arrived and they were apprised of the investigation to that point. At that point, defendant was transported to an interview at Chicago police headquarters by Kato's partner. They returned at approximately 1 a.m. on September 12, 1996.

¶ 34 Kato and his partner interviewed defendant again and defendant stated that he "wanted to tell the truth." He informed the detectives of his real name and stated that he and Williams were the shooters. Defendant further stated that Smith was bothering defendant and Williams and that they observed him standing outside and shot at him. Defendant also admitted being a Traveling Vice Lord and stated that the conflict began when Smith wanted Williams and defendant to sell drugs for him. When defendant refused, Smith and the Dog Pound became angry and began shooting at him. Williams told defendant that he was "tired of Puff shooting at him and bothering him and they were going to get even." Defendant told Kato that he was in Williams' vehicle when they observed Smith and other members of the Dog Pound standing outside. Defendant and Williams then went to a friend's house and obtained two handguns, two black-hooded sweatshirts, and two pairs of gloves; the guns were described as 9-millimeter semiautomatic handguns. They drove to the area in which Smith was

---

[8]The record indicates that the other investigator was the technician who administered the polygraph test.

standing, then walked toward the group. Approximately 15 to 20 feet away, defendant began shooting at Smith and "Elroy."[9] Defendant shot his gun four to five times.

¶ 35    After the shooting, defendant and Williams fled in different directions and defendant went home, throwing his gun into the park on the way. He met up with Williams several hours later and they burned the sweatshirts and the gloves. Defendant learned after the shooting that Smith had not been shot, but that a woman and a man were shot.

¶ 36    After speaking with defendant, Kato again contacted the felony review unit of the State's Attorney's office and Assistant State's Attorneys Ziegler and Dorner returned. Kato also testified that Smith and Nash were both members of the Dog Pound.

¶ 37    The State also presented the testimony of the three surviving shooting victims. Lucinda Birmingham testified that during the shooting, she was shot in the leg; the bullet entered her right upper thigh and exited through the back of her thigh. After being shot, Birmingham fell over into a vacant lot next to Wash's Place and, after 10 to 15 seconds, crawled to the curb so that she would be noticeable to pedestrians. Birmingham testified that she observed two young men running, but could not describe them because she observed them from the back. The men appeared to be 18 or 19 years old, one was dressed in black, and one had his hair braided. Birmingham testified that the paramedics came, and after checking her injury, they had her wait approximately 20 minutes for an ambulance because others were more seriously hurt and Birmingham said that she was "feeling okay." Birmingham was taken to the hospital, where she testified that "[t]hey saw that I wasn't really injured like the other pedestrians on the street. So it took awhile for me to get assistance from the nurses and doctors. So I was there a total maybe about five or six hours." After her wounds were treated and cleaned, Birmingham was allowed to return to her home.

¶ 38    Crystal Pope testified that at the time of the shooting, her cousin observed her arm bleeding and informed Pope that she had been shot. Pope fell, and her cousin picked her up and pulled her onto the sidewalk. Pope looked at her arm and observed her left arm bleeding; the bullet went through her arm and entered her body, where it lodged in the lower part of her spine. The ambulance took Pope to the hospital, where she was taken for emergency surgery. After the surgery, Pope was in the hospital for approximately 19 days. Pope did not provide any description of the shooters.

¶ 39    Finally, Charles Mitchell testified that after hearing gunshots, he looked down and observed that his pants had a hole in the leg and that his left leg was bleeding. Mitchell turned and ran to his house, approximately a block away. His mother was at his house and told him to return to the scene so that he could be taken to the hospital. He returned to the scene and waited for an ambulance for approximately 30 minutes and then was taken to the hospital, where his leg was X-rayed and cleaned, and then he was permitted to leave. Mitchell testified that the bullet went through his leg.

¶ 40    The State also presented evidence that a medium-caliber, fully metal jacketed lead bullet was recovered from Thomas' body. Additionally, police recovered five 9-millimeter discharged cartridge casings, a fired bullet, a baseball cap, and a cigarette lighter from the

[9]The record does not identify Elroy.

scene of the murder. Both fired bullets were 9-millimeter, .38-caliber bullets. Four of the five cartridge casings were fired from the same firearm, but the fifth was fired from a different firearm. No weapon was recovered, and the State's expert was unable to determine whether the fired bullets came from the recovered casings.

¶ 41    Assistant State's Attorney Susan Ziegler also testified on behalf of the State. Her testimony was essentially the same as in the motion to suppress. Defendant's statement was then offered and received into evidence and then published to the jury, and the relevant parts read as follows:

"Statement of DeAngelo Johnson taken 9-12-96 at 4:10 a.m. at Area 4 violent crimes.
***

DeAngelo Johnson states that on August 23, 1996, he was with Bernard Williams. DeAngelo and Bernard were in a car when they saw Puff. When they saw Puff, he was with 3 of his friends; one was Elroy. When they saw Puff, they decided to go and get guns to teach him a lesson to leave DeAngelo and Bernard alone. Puff was trying it [sic] get De[A]ngelo and Bernard to sell drugs for him.

Puff is the leader of a gang called the Dog Pound. When De[A]ngelo and Bernard went [sic] sell drugs for Puff, he threatened them. On August 21, 1996, Puff shot up Bernard's house meaning they fired 15 shots into Bernard's house. So on August 23, 1996 when Bernard and De[A]ngelo saw Puff, they decided to teach Puff a lesson. Bernard went to a friend's house to get the guns. Bernard then picked up DeAngelo at Washington and Karlov and gave DeAngelo a 9 Glok [sic], a black hoodie sweatshirt and black leather gloves.

Bernard had a 9 Rueger [sic] gun and showed DeAngelo how to use the gun that he had given him. DeAngelo and Bernard then walked from Bernard's house to Madison and Keeler where they had seen Puff earlier.

When they got ten feet from Puff by the bar on Madison, Bernard up'd the gun meaning he pulled it out of his pants and DeAngelo also pulled out the gun he had in his pants and both fired at Puff. Puff was standing by the bar with 3 other people who were black males.

Bernard fired 5 or 6 times. DeAngelo fired 4 times at the same time at Puff and Elroy. After the shooting, DeAngelo ran towards Monroe and Bernard ran in a different direction. DeAngelo threw the gun he had in a pond in Garfield Park.

DeAngelo and Bernard were dressed all in black with black hooded sweatshirts, black pants and black gloves when they did the shooting.

DeAngelo states that he burned the hoodie and the gloves after the shooting at Wilcox and Pulaski in the alley with Bernard. Bernard also burned his hoodie and gloves at that time also. Bernard told DeAngelo that they had got Puff because he Puff had slowed down after the shooting.

DeAngelo states that he has been treated well by the police and by the assistant state's attorney Ziegler and Dorner. DeAngelo states that he was given [c]offee and water to drink, cigarettes to smoke and they let DeAngelo go to the bathroom 4 times. DeAngelo

states that no threats or promises have been made to him in return for his statement."

¶ 42   In its case-in-chief, the defense called Detective David DalPonte to testify on defendant's behalf.[10] DalPonte testified that he spoke with Nash at the hospital on August 23, 1996, and Nash provided him with a description of the offenders: "two male blacks between the ages of 16 and 19, average size, five-seven, five-nine, slimly built, dressed in dark clothing, black hooded sweat shirts, blue shorts, black gloves and black baseball type hats." Nash told DelPonte that he did not recognize them from the neighborhood but that Puff might know them. Defendant did not testify on his own behalf.

¶ 43   During its closing argument, the State commented:

"You know, not only did they put the witnesses on trial, but they tried to attack the validity of the testimony of the statement. Ladies and gentlemen, there is absolutely no evidence before you to contest the validity of the statement. Nothing. It's uncontested. The validity of that handwritten statement is uncontested. An attorney can stand before you and argue all he wants about what he wishes the statement to say or what it doesn't say. But you know what? There is no evidence to contradict the validity of the statement. None."

The State further noted:

"You know, they even suggest somehow he wasn't treated well at the police station. Really? Did you hear any evidence of that during the trial, that he wasn't treated well? None. None. He was treated fine. And because there's nothing to contest the validity of this statement, what do you get? You get poor, old DeAngelo. Feel sorry for DeAngelo. He was only 17."

¶ 44   The jury found defendant guilty of first degree murder and three counts of aggravated battery with a firearm. Defendant was sentenced to 75 years in the Illinois Department of Corrections: 45 years for the murder count and 10 years for each of the counts of aggravated battery with a firearm, with the sentences to be served consecutively.

¶ 45                                III. Appeal

¶ 46   On direct appeal, defendant raised five issues: "(1) whether evidence of his gang membership denied him a fair trial; (2) whether veiled evidence he failed a polygraph test denied him a fair trial; (3) whether evidence of his prior arrests and convictions denied him a fair trial; (4) whether the prosecutor's closing argument denied him a fair trial; and (5) whether his attorney's ineffectiveness denied him a fair trial." *People v. Johnson*, 317 Ill. App. 3d 666, 668 (2000). The appellate court noted that the first three issues were not properly preserved and that defendant attributed those omissions to ineffective assistance of counsel but stated that "[w]e need not address *Strickland v. Washington*, [citation], because

_____

[10]Defendant also presented the testimony of Dr. Dawna Gutzmann, a psychiatrist who testified about defendant's ability to understand and waive his *Miranda* rights. Cordelia Parker, defendant's special education teacher, also testified on defendant's behalf concerning his behavior and abilities in school.

-11-

the failure to preserve these issues implicates the plain error rule." *Johnson*, 317 Ill. App. 3d at 668.

¶ 47 The court determined that the case was closely balanced because Nash was the only eyewitness, and he was a member of the intended target's gang, was a convicted felon, and insisted he identified both defendant and Williams from the photo array while Kato testified that Nash only identified Williams from the photo array. *Johnson*, 317 Ill. App. 3d at 669. Additionally, the court noted that the probative value of defendant's statement was contested by the defense, who presented a psychiatric opinion that defendant's low intelligence, reading impairment, and dependent personality cast doubt on his ability to understand and waive his *Miranda* rights and made him susceptible to suggestion. *Johnson*, 317 Ill. App. 3d at 669.

¶ 48 The court examined each of defendant's arguments and found that the trial court did not abuse its discretion in permitting the gang evidence and that the "clear inference" that defendant had failed a polygraph test "was proper where Johnson contended his inculpatory statement was involuntary" by presenting evidence of defendant's reading ability and suggestibility. *Johnson*, 317 Ill. App. 3d at 671, 673. However, the appellate court found that the trial court abused its discretion in permitting evidence of defendant's prior arrests and that the prosecution made improper statements during closing arguments "ask[ing] the jury to penalize Johnson for exercising both his fifth amendment privilege against self-incrimination and his sixth amendment right to counsel." *Johnson*, 317 Ill. App. 3d at 675, 676. The court noted that these errors cast doubt on the fairness of defendant's trial but found that it did not need to decide whether any one error would result in reversal because, " '[c]umulatively, we find that the errors created a pervasive pattern of unfair prejudice to defendant's case.' " *Johnson*, 317 Ill. App. 3d at 677 (quoting *People v. Blue*, 189 Ill. 2d 99, 139 (2000)). Consequently, the appellate court reversed defendant's conviction and remanded the case to the trial court for a new trial. *Johnson*, 317 Ill. App. 3d at 677.

¶ 49 The Illinois Supreme Court reversed the appellate court's decision. *People v. Johnson*, 208 Ill. 2d 53 (2004). The court found that the trial court's evidentiary rulings concerning gang evidence, polygraph test evidence, and other crimes evidence were proper. *Johnson*, 208 Ill. 2d at 103, 105-06, 108-09. The court also considered a number of the challenged statements in the prosecutor's closing argument and found that they were not improper. *Johnson*, 208 Ill. 2d at 110-15. The supreme court found that any improper comments that the prosecutor did make did not deny defendant a fair trial. *Johnson*, 208 Ill. 2d at 117. The court further found that the evidence was not closely balanced, stating that the jury had before it defendant's confession, "physical evidence corroborating the statement" in the shell casings and bullets recovered at the shooting, and "the uncontradicted testimony of an eyewitness to the shooting." *Johnson*, 208 Ill. 2d at 117. The court further noted that Nash's version of the shooting was consistent with defendant's statement and "Nash's identification of Johnson as one of the two shooters was not contradicted by either positive testimony or by circumstances." *Johnson*, 208 Ill. 2d at 117. The court found that, "[i]n sum, the prosecutor's comments, quite simply, did not result in substantial prejudice to Johnson under these circumstances, and thus, they do not warrant reversal of Johnson's convictions." *Johnson*, 208 Ill. 2d at 117. The supreme court remanded the case to the appellate court to consider defendant's arguments of ineffective assistance of trial counsel. *Johnson*, 208 Ill.

2d at 117.

¶ 50      On remand, the appellate court issued a summary order affirming the judgment of the trial court. *People v. Johnson*, No. 1-98-4680 (2004) (summary order).

¶ 51                              IV. Postconviction Petition

¶ 52      On August 16, 2004, defendant filed a *pro se* petition for postconviction relief. The public defender was appointed to represent defendant and on November 19, 2008, filed an amended petition for postconviction relief. The amended petition claimed: (1) defendant was denied effective assistance of counsel when his attorney failed to investigate, discover, and present additional evidence at the motion to suppress to support defendant's claim that his confession was coerced by Kato; (2) the State intentionally withheld exculpatory evidence proving defendant's actual innocence; and (3) new evidence of a pattern of physical and mental coercion by Kato demonstrates that the trial court erred in denying defendant's motion to suppress his statement.

¶ 53      The petition claimed that defendant's trial counsel was ineffective in failing to interview, investigate, or present evidence corroborating defendant's claims that his confession was the product of police abuse and that, had trial counsel interviewed or investigated Kato's police record and history, he would have discovered evidence that Kato had abused other suspects in the same manner as he abused defendant. The petition referred to and attached an article from the Chicago Tribune dated February 4, 1993, that contained claims from a former assistant public defender that several of her clients had claimed that Kato used force to obtain confessions from them and that Kato had over 20 physical force complaints against him during the period of September 1985 to May 1990. The petition also referred to and attached another Chicago Tribune article, dated July 14, 1991, that stated that since 1988, 25 criminal suspects had testified in court or to the Chicago police's Office of Professional Standards (OPS) that Kato beat or threatened them during questioning. The article also quoted an assistant public defender who told the trial court in a hearing on a criminal case that Kato used physical abuse in order to obtain confessions. The petition claimed that the articles, and their quotes from assistant public defenders, demonstrated that the Public Defender's Office was aware that a number of complaints had been filed in court or with OPS stating that Kato abused suspects to obtain confessions and also demonstrated that there was available evidence that defendant's trial counsel could have and should have obtained to corroborate defendant's claims of abuse. The petition also pointed to the prosecution's statements in closing argument that there was no evidence to attack the validity of defendant's confession. The petition also noted that trial counsel never presented evidence of a coerced confession at trial.

¶ 54      The petition also claimed that the State intentionally withheld exculpatory evidence proving defendant's actual innocence. The petition claimed that the State was aware of the many complaints filed with OPS that Kato had abused other suspects in the same way that he abused defendant. Had the State turned over this evidence, there was a "great possibility" that the result of the trial would have been different.

¶ 55      In support of defendant's claim of new evidence, the petition claimed that Kato had been

-13-

the defendant in a number of civil rights lawsuits alleging police brutality and listed six cases dated from February 1998 through April 2003. All of the cases were filed after the trial court denied defendant's motion to suppress his statement in the instant case. The petition claimed that these lawsuits presented new evidence that other people have raised physical and mental coercion claims against Kato. Finally, the petition claimed that the cumulative effect of the errors denied defendant his constitutional rights and also claimed that waiver and *res judicata* should not apply to bar his claims.

¶ 56    Attached to the amended petition were defendant's affidavit, the two newspaper articles, a list of lawsuits filed against Kato, and several court decisions referring to a pattern of conduct and OPS investigations of Kato.

¶ 57    On May 20, 2009, the State filed a motion to dismiss the petition for postconviction relief. The motion claimed that the decisions concerning the manner of litigating the suppression hearing and the failure to use collateral cases at the motion was a matter of trial strategy. The motion further claimed that the newspaper articles were inadmissible collections of hearsay statements and contained self-serving statements made by attorneys with vested interests in the outcome of their cases. The motion further claimed that the issue could have been raised on appeal and was therefore waived and that *res judicata* should apply where trial counsel was criticized on appeal for failing to raise other issues.

¶ 58    The motion also claimed that the State's alleged failure to turn over exculpatory evidence was flawed because information about OPS complaints was not in the State's possession, the information was not material, and defendant's pleadings are conclusory. Finally, the motion claimed that defendant's "new evidence" was merely supplementing defendant's claim that his confession was coerced and did not support a freestanding claim of actual innocence.

¶ 59    On September 23, 2009, the trial court issued a written order. The court found that the newspaper articles did not constitute evidence of police brutality and were not admissible. The court also found that the claim that trial counsel was ineffective in failing to use the collateral cases to attack Kato's credibility was meritless because unrelated cases are not relevant unless they occur close in time and have factual similarities to the pending case, and the decision whether to use them was a matter of trial strategy.

¶ 60    The court also found that the State did not withhold exculpatory evidence. The newspaper articles were not material, and defendant failed to attach any OPS records or civil suits, making the allegations baseless and conclusory. Additionally, defendant's newly discovered evidence was being used to supplement his assertions of constitutional violations with respect to his trial and did not properly raise a claim of actual innocence. Consequently, the trial court granted the State's motion to dismiss and dismissed defendant's petition for postconviction relief. Defendant filed a notice of appeal the same day.

¶ 61                                    ANALYSIS

¶ 62    On appeal, defendant argues: (1) he made a substantial showing that his right to effective counsel was violated and (2) two of defendant's consecutive sentences are void because the

victims did not suffer severe bodily injury.[11] We consider each of defendant's arguments in turn.

¶ 63                              I. Stages of a Postconviction Proceeding

¶ 64     The Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2000)) provides a means by which a defendant may challenge his or her conviction or sentence for violations of federal or state constitutional rights. *People v. Pendleton*, 223 Ill. 2d 458, 471 (2006) (citing *People v. Whitfield*, 217 Ill. 2d 177, 183 (2005)). To be entitled to postconviction relief, a defendant must show that he or she has suffered a substantial deprivation of his or her federal or state constitutional rights in the proceedings that produced the conviction or sentence being challenged. 725 ILCS 5/122-1(a) (West 2000); *Pendleton*, 223 Ill. 2d at 471 (citing *Whitfield*, 217 Ill. 2d at 183).

¶ 65     In noncapital cases, the Act provides for three stages. *Pendleton*, 223 Ill. 2d at 471-72. At the first stage, the trial court has 90 days to review a petition and may summarily dismiss it, if the trial court finds that the petition is frivolous and patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2000); *Pendleton*, 223 Ill. 2d at 472. If the trial court does not dismiss the petition within that 90-day period, the trial court must docket it for further consideration. 725 ILCS 5/122-2.1(b) (West 2000); *Pendleton*, 223 Ill. 2d at 472.

¶ 66     The Illinois Supreme Court has held that, at this first stage, the trial court evaluates only the merits of the petition's substantive claim, and not its compliance with procedural rules. *People v. Perkins*, 229 Ill. 2d 34, 42 (2007). The issue at this first stage is whether the petition presents an "arguable basis either in law or in fact." *People v. Hodges*, 234 Ill. 2d 1, 11-12 (2009).

¶ 67     In the case at bar, defendant's petition proceeded to the second stage. The Act provides that, at the second stage, counsel may be appointed for defendant, if defendant is indigent. 725 ILCS 5/122-4 (West 2000); *Pendleton*, 223 Ill. 2d at 472. After an appointment, Illinois Supreme Court Rule 651(c) (eff. Dec. 1, 1984) requires the appointed counsel: (1) to consult with petitioner by mail or in person; (2) to examine the record of the challenged proceedings; and (3) to make any amendments that are "necessary" to the petition previously filed by the *pro se* defendant. *Perkins*, 229 Ill. 2d at 42. Our supreme court has interpreted Rule 651(c) also to require appointed counsel "to amend an untimely *pro se* petition to allege any available facts necessary to establish that the delay was not due to the petitioner's culpable negligence." *Perkins*, 229 Ill. 2d at 49.

¶ 68     The Act provides that, after defense counsel has made any necessary amendments to the petition, the State may move to dismiss it. *Pendleton*, 223 Ill. 2d at 472 (discussing 725 ILCS 5/122-5 (West 2000)). See also *Perkins*, 229 Ill. 2d at 43. If the State moves to dismiss, the

---

[11]Defendant raised a third issue concerning correcting the mittimus to reflect the correct number of days he was in presentence custody. However, defendant and the State agree that in light of the Illinois Supreme Court's recent case of *People v. Williams*, 239 Ill. 2d 503 (2011), defendant is entitled to credit for 813 days of presentence credit instead of the 812 days that the mittimus currently reflects and we need not address defendant's argument further.

trial court may hold a dismissal hearing, which is still part of the second stage. *People v. Coleman*, 183 Ill. 2d 366, 380-81 (1998). A trial court is foreclosed "from engaging in any fact-finding at a dismissal hearing because all well-pleaded facts are to be taken as true at this point in the proceeding." *Coleman*, 183 Ill. 2d at 380-81. A court reviewing a dismissal of a postconviction petition without an evidentiary hearing will do so *de novo*. *People v. Edwards*, 195 Ill. 2d 142, 156 (2001) (citing *Coleman*, 183 Ill. 2d at 389). *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011). In the case at bar, the trial court dismissed defendant's petition at the second stage.

¶ 69                                    II. Ineffective Assistance of Counsel

¶ 70        Defendant argues that his attorneys were ineffective in two ways: (1) the assistant public defender representing him during the motion to suppress his statements was ineffective for failing to investigate and present evidence corroborating Kato's abuse of defendant and (2) the private attorney representing defendant at trial was ineffective for failing to present the evidence of Kato's abuse at trial. The State argues that these claims have been forfeited since they are based on evidence that was available at the time of trial or on direct appeal. Issues that were decided on direct appeal are *res judicata*, and any issues that could have been presented on direct appeal, but were not, are forfeited. *People v. Rogers*, 197 Ill. 2d 216, 221 (2001). "These rules are relaxed, however, where the facts relating to the issue of [counsel's] incompetency do not appear on the face of the record." *People v. Eddmonds*, 143 Ill. 2d 501, 528 (1991); see also *People v. Whitehead*, 169 Ill. 2d 355, 372 (1996). In the case at bar, defendant's claims of ineffectiveness are based on newspaper articles and legal cases that were not part of the record on appeal, so we may consider the merits of the claims. We also note that the claims of ineffectiveness considered on direct appeal concerned only trial counsel's failure to properly preserve certain evidentiary rulings by the trial court; they did not address the assistant public defender's conduct during the suppression hearing, nor did they address defendant's allegedly coerced confession. See *Johnson*, 317 Ill. App. 3d at 668. Accordingly, we proceed to the merits of defendant's claims.

¶ 71        The Illinois Supreme Court has held that, to determine whether a defendant was denied his or her right to effective assistance of counsel, an appellate court must apply the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Colon*, 225 Ill. 2d 125, 135 (2007) (citing *People v. Albanese*, 104 Ill. 2d 504 (1984) (adopting *Strickland*)). Under *Strickland*, a defendant must prove both (1) his attorney's actions constituted errors so serious as to fall below an objective standard of reasonableness; and (2) absent these errors, there was a reasonable probability that his trial would have resulted in a different outcome. *People v. Ward*, 371 Ill. App. 3d 382, 434 (2007) (citing *Strickland*, 466 U.S. at 687-94).

¶ 72        Under the first prong of the *Strickland* test, the defendant must prove that his counsel's performance fell below an objective standard of reasonableness "under prevailing professional norms." *Colon*, 225 Ill. 2d at 135; *People v. Evans*, 209 Ill. 2d 194, 220 (2004). Under the second prong, the defendant must show that, "but for" counsel's deficient

performance, there is a reasonable probability that the result of the proceeding would have been different. *Colon*, 225 Ill. 2d at 135; *Evans*, 209 Ill. 2d at 220. "[A] reasonable probability that the result would have been different is a probability sufficient to undermine confidence in the outcome–or put another way, that counsel's deficient performance rendered the result of the trial unreliable or fundamentally unfair." *Evans*, 209 Ill. 2d at 220; *Colon*, 225 Ill. 2d at 135. In other words, the defendant was prejudiced by his attorney's performance.

¶ 73    To prevail, the defendant must satisfy both prongs of the *Strickland* test. *Colon*, 225 Ill. 2d at 135; *Evans*, 209 Ill. 2d at 220. "That is, if an ineffective-assistance claim can be disposed of because the defendant suffered no prejudice, we need not determine whether counsel's performance was deficient." *People v. Graham*, 206 Ill. 2d 465, 476 (2003). We do not need to consider the first prong of the *Strickland* test when the second prong cannot be satisfied. *Graham*, 206 Ill. 2d at 476.

¶ 74    In the case at bar, defendant claims that pretrial counsel was ineffective for failing to investigate Kato's history of abuse and both pretrial and trial counsel were ineffective for failing to present the evidence of Kato's history of abuse at the suppression hearing and at trial, respectively. Defendant argues that this evidence would have corroborated his claim that his confession was coerced. Defendant attached several exhibits to his postconviction petition in support of his claims: (1) defendant's affidavit, stating that Kato used physical force to coerce defendant into falsely confessing and that defendant informed all of his attorneys of the abuse; (2) two articles from the Chicago Tribune discussing allegations of abuse against Kato, both of which were published several years before defendant's arrest; (3) computer printouts from CourtLink Corporation showing that six civil actions were filed against Kato in federal court; and (4) seven federal court opinions referencing Kato, four of which contained allegations that Kato physically abused suspects. We must determine whether defendant's allegations and the accompanying documentation provide a substantial showing that his right to effective assistance of counsel was violated. In the case at bar, we find that they do not because we cannot find that defendant has provided a substantial showing that his counsel's performance was deficient.

¶ 75    Defendant argues that pretrial counsel failed to investigate Kato's pattern of coercion and pretrial and trial counsel failed to present the evidence at the suppression hearing and at trial. However, the "evidence" that defendant claims supports his argument is insufficient to make a substantial showing of ineffectiveness. While defendant is correct that the newspaper articles could be admissible at the suppression hearing, the trial court may still use its judgment and experience to determine what weight to afford them. See *People v. Patterson*, 192 Ill. 2d 93, 113 (2000) (quoting *United States v. Matlock*, 415 U.S. 164, 175 (1974)). Newspaper articles are " 'often, if not notoriously, apt to be inaccurate' " because they " 'are frequently based on the hearsay statements of others, or on the statements of bystanders, witnesses to the occurrence, public officers, and other informants.' " *McCall v. Devine*, 334 Ill. App. 3d 192, 203 (2002) (quoting Robert Steigmann, Illinois Evidence Manual § 14:28, at 365 (2d ed. 1995)). Here, the newspaper articles contain claims that Kato has a history of abusing suspects, including references to Kato karate-chopping suspects. The articles also note that no complaints against Kato have ever been sustained, provide examples of

defendants who claimed Kato abused them when he was not even on duty, and contain claims from prosecutors that defendants automatically accuse Kato of abuse when he is involved with the case in hopes of being released. Thus, the articles do not completely support defendant's claims, but also point out that Kato has been accused of abuse as a defense tactic at times. We cannot say that failure to present newspaper articles demonstrated counsel's ineffectiveness, and defendant has presented no evidence that his attorneys failed to investigate the abuse listed in the newspaper articles or were even made aware of the allegations in the newspaper articles.

¶ 76    Additionally, the cases that defendant attached to his postconviction petition do not demonstrate counsel's ineffectiveness. The list of cases showing that Kato was a defendant do not contain any information as to the basis of the lawsuits, so there is no way to tell whether those cases involved allegations of abuse. Furthermore, of the seven federal court cases that defendant attached to his petition, three contain no references to physical abuse whatsoever. The four cases that contain references to physical abuse do so in the following ways: (1) an allegation that Kato was "the bad guy" when he and another detective "played 'good cop/bad cop' " and was "hurting" the plaintiff (*Wallace v. City of Chicago*, 440 F.3d 421, 423 (7th Cir. 2006)); (2) an allegation that Kato had a " 'long and well known histor[y] of . . . police brutality' " and that Kato handcuffed the plaintiff to a wall, slapped him in the face, and threatened to beat him further (*Seaton v. Kato*, No. 94 C 5691, 1995 U.S. Dist. LEXIS 2380, at **5-6 (N.D. Ill. Feb. 1, 1995)); (3) allegations that Kato "struck and kicked" the plaintiff and kept him awake for approximately 20 hours, as well as allegations that Kato was "a known repeater with at least ten separate OPS complaints against him for excessive force and/or false arrests in the past few years and several other similar incidents not subject to complaint" (*Waslewski v. Kato*, No. 92 C 6940, 1993 U.S. Dist. LEXIS 269, at **1, 10-11 (N.D. Ill. Jan. 13, 1993)); and (4) allegations that the plaintiff was "kicked, kneed, and scraped with a metal rod" by some of the defendants while others watched and that Kato "placed a pistol in the plaintiff's mouth and threatened to 'make him a statistic' " (*Steward v. Summerville*, No. 90 C 6956, 1992 U.S. Dist. LEXIS 15690, at *2 (N.D. Ill. Oct. 14, 1992)). None of the cases contained findings on the merits concerning the allegations of abuse by Kato. We cannot find that these bare allegations are sufficient to provide a substantial showing of counsel's ineffectiveness.

¶ 77    In support of his argument, defendant chiefly relies on the Illinois Supreme Court's decision of *People v. Patterson*, 192 Ill. 2d 93 (2000). Defendant argues that his case is similar to that of *Patterson*, and that the same factors relied upon by the *Patterson* court are present here. In *Patterson*, the court considered the defendant's claim that new evidence supported his claim that his confession was the result of torture. The new evidence included numerous allegations of abuse and OPS findings of systemic abuse in Area 2. *Patterson*, 192 Ill. 2d at 141, 142.

¶ 78    After considering the evidence, the court found that the defendant was entitled to an evidentiary hearing and listed four factors that it found particularly significant: (1) the defendant consistently claimed that he was tortured, (2) the defendant's claims were "strikingly similar" to other claims of torture, (3) the officers that the defendant alleged were involved in his case were the same officers that had been identified in other allegations of

torture, and (4) the defendant's allegations were consistent with the OPS findings that torture was "systemic and methodical at Area 2 under the command of [Lieutenant Jon] Burge." *Patterson*, 192 Ill. 2d at 145; see also *People v. Wrice*, 406 Ill. App. 3d 43, 53 (2010).

¶ 79 We find defendant's attempts to analogize his situation to that present in *Patterson* to be unpersuasive. First, the type of evidence presented in *Patterson* is a far cry from the type submitted by defendant in the case at bar. Defendant argues that the use of allegations of torture in *Patterson* and the use of a complaint by the court in *People v. King*, 192 Ill. 2d 189, 198 (2000), demonstrate that a finding of abuse was not necessary in order to make a substantial showing of ineffectiveness. However, defendant fails to acknowledge that both *Patterson* and *King* contained a great deal of other evidence. The postconviction petitions in both cases included a report from OPS "finding that physical and psychological abuse was systemic and methodical in Area 2 from 1973 through 1986." *Patterson*, 192 Ill. 2d at 124; see also *King*, 192 Ill. 2d at 198 (noting that the OPS report attached was the same report as in *Patterson*). *Patterson* also included two appellate court decisions holding that Burge tortured Andrew Wilson and that Burge was properly fired for his role in torturing Wilson. *Patterson*, 192 Ill. 2d at 139. Similarly, *King* included a report from the Federal Bureau of Investigation concerning mistreatment of a defendant in another case and the decision by the Chicago police board dismissing Burge from his position within the police department. *King*, 192 Ill. 2d at 198. Thus, *Patterson* and *King* had much more concrete evidence than is present in the case at bar. Here, as noted, defendant provides only two newspaper articles and documentation showing that lawsuits were filed against Kato. Defendant claims that the articles and cases could result in witnesses testifying at his evidentiary hearing. However, there are no affidavits from any potential witnesses, nor is there any indication that these witnesses would testify.

¶ 80 Additionally, the allegations of abuse in the newspaper articles and cases submitted by defendant are not as similar as defendant claims. While some of the behaviors alleged in the cases and newspaper articles are similar to defendant's allegations, as a whole, they are not "strikingly similar." See *Patterson*, 192 Ill. 2d at 145. There is no pattern of specific types of abusive behavior present, as there was in *Patterson*. See *Patterson*, 192 Ill. 2d at 145 (noting that the claims were "strikingly similar" to other claims involving the use of a typewriter cover to simulate suffocation, the use of a gun as a threat, and beatings that did not leave physical evidence). Most importantly, in *Patterson*, the defendant presented evidence that at least one police officer involved was relieved of his police duties and taken off the street. There is no such evidence here. Furthermore, in *Patterson*, the OPS made a finding of improper police conduct, including torture. There is no evidence here of any adverse OPS findings against Kato.

¶ 81 At the second stage of postconviction proceedings, defendant must provide a substantial showing of a constitutional violation. In the case at bar, defendant has failed to make such a showing. Accordingly, we cannot find that the trial court erred in dismissing defendant's postconviction petition.

¶ 82 Similarly, we cannot say that defendant has made a substantial showing that trial counsel was ineffective for failing to present evidence of Kato's abuse during defendant's trial. In that situation, trial counsel's failure to present the defense could have been trial strategy. The

-19-

question of what defense will be presented at trial is trial strategy, and here, trial counsel chose to present a defense other than that of coercion. At trial, defense counsel decided to challenge defendant's confession by arguing that defendant was not able to waive his *Miranda* rights by focusing on defendant's low intelligence. Unlike the motion to suppress, there was no testimony at trial, from any witness, that defendant's testimony was coerced. Thus, we cannot say that trial counsel's behavior fell below an objective standard of reasonableness.

¶ 83                                    III. New Evidence

¶ 84        As part of his ineffectiveness argument, defendant also argues that new evidence corroborated his claim that he was abused by Kato. In the case at bar, defendant analogizes his case to that of *Patterson*, arguing that he has consistently alleged that Kato physically coerced defendant into falsely confessing, the information in the newspaper articles and legal cases contain similar allegations of abuse, and the same officer was involved in all of the cases. However, we must focus on defendant's "new evidence" and not the evidence that was available to him during the motion to suppress and at trial, which we have discussed above.

¶ 85        Here, defendant's "new evidence" consists of one federal civil case that was filed after defendant was convicted: *Wallace v. City of Chicago*, 440 F.3d 421 (7th Cir. 2006).[12] In that case, the plaintiff alleged that Kato and another detective "played 'good cop/bad cop' with him to induce him to confess falsely." *Wallace*, 440 F.3d at 423. Kato was the "bad guy," and the other detective told the plaintiff that if he confessed the detective "could get Kato to stop hurting him." *Wallace*, 440 F.3d at 423. The Seventh Circuit did not decide the merits of the allegations against Kato, but instead affirmed the grant of summary judgment in favor of all of the defendants because the claim, based on false arrest, was time-barred. *Wallace*, 440 F.3d at 427.

¶ 86        We cannot find that this case provides new evidence as contemplated by *Patterson*. While Kato was involved in the case, and it did involve an allegation of physical abuse, it was not "strikingly similar" to defendant's allegations but instead was a generalized allegation that Kato was "hurting" the plaintiff. See *Wallace*, 440 F.3d at 423. Further, defendant here does not provide an affidavit from any other person that experienced physical abuse by Kato. Accordingly, we cannot find that the claim of new evidence is sufficient to proceed to an evidentiary hearing.

¶ 87                                    IV. Sentencing

¶ 88        Defendant also argues that he should have been sentenced concurrently and not consecutively for two of his aggravated battery convictions because Birmingham and Mitchell did not sustain severe bodily injury. Defendant failed to raise this issue at trial, on direct appeal, or in his postconviction petition. Thus, we must determine whether defendant

---

[12]Defendant's computer printout shows that another civil case was filed against Kato during this time, but there is no information about the allegations in that case.

has forfeited this claim.

¶ 89    Defendant argues that he has not forfeited his claim because the consecutive sentences are void, while the State argues that the sentences are merely voidable and thus capable of being waived. A sentence that is not authorized by statute is void. *People v. Thompson*, 209 Ill. 2d 19, 23 (2004). In the case at bar, defendant was sentenced to consecutive sentences based on section 5-8-4(a) of the Unified Code of Corrections:

> "The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective, unless, one of the offenses for which defendant was convicted was a Class X or Class 1 felony and the defendant inflicted severe bodily injury ***." 730 ILCS 5/5-8-4 (West 1992).

Defendant argues that since Birmingham and Mitchell did not suffer severe bodily injury, the trial court was without authority to impose consecutive sentences. We agree.

¶ 90    The question of the propriety of defendant's sentence depends on the trial court's determination that defendant inflicted severe bodily injury. In the case at bar, defendant was tried simultaneously with Bernard Williams. When we considered Williams' case on direct appeal, we found that it was not clear that Birmingham and Mitchell suffered severe bodily injury and remanded the case to the trial court to make that determination. *People v. Williams*, 335 Ill. App. 3d 596, 601 (2002). On remand, the trial court determined that Birmingham and Mitchell had not suffered severe bodily injury and ordered Williams' consecutive sentences for the two batteries to be served concurrently. See *People v. Williams*, No. 1-07-3102 (2010) (unpublished order under Supreme Court Rule 23). Given the fact that the same judge presided over both trials, it must be the case that there was no severe bodily injury present in defendant's case, as well.

¶ 91    If there was no severe bodily injury inflicted, the trial court was without authority to order the sentences for Birmingham's and Mitchell's batteries to be served consecutively. Accordingly, the sentences were void and the issue may be considered at present. As we have noted, the trial court found that there was no severe bodily injury, so we order defendant's sentences on the counts of battery involving Birmingham and Mitchell to be served concurrently and not consecutively. Therefore, defendant is to serve 45 years for the murder and 10 years for the aggravated battery of Pope, to be served consecutively, for a total of 55 years. The two 10-year terms for the aggravated battery of Birmingham and Mitchell shall be served concurrently with the sentences for the murder and the aggravated battery of Pope.

¶ 92                                    CONCLUSION

¶ 93    We find that defendant has failed to make a substantial showing that counsel was ineffective in failing to present evidence corroborating defendant's claims of physical abuse at defendant's suppression hearing and affirm the dismissal of defendant's postconviction petition. We also order the sentencing order to be modified to reflect the two counts of aggravated battery involving Birmingham and Mitchell to be served concurrently and order the mittimus to be corrected to reflect 813 days in presentence custody.

¶ 94         Affirmed; sentencing order and mittimus corrected and modified.